JAMES MORAN ET AL. *vs.* JULIA C. BENTLEY, ADMINISTRATRIX.

Second Judicial District, Norwich, May Term, 1897. ANDREWS, C. J.,
TORRANCE, FENN, BALDWIN AND HAMERSLEY, Js.

A party cannot allege one cause of action and recover judgment upon
another. Accordingly judgment for an accounting will not be advised
by this court upon a reservation, if the allegations of the complaint,
upon which the prayer is based, are found untrue by the trial court.
Nor is it material to inquire, under such circumstances, whether judgment for an accounting would have been advised, had the allegations
of the complaint been found to be true.

[Argued May 25th—decided July 13th, 1897.]

ACTION for an accounting and for damages, brought to the Superior Court in New London County and reserved by that court, *Robinson, J.*, upon a finding of facts, for the consideration and advice of this court. *Superior Court advised that on the facts found the plaintiffs are not entitled to an accounting.*

The case is sufficiently stated in the opinion.

*Solomon Lucas* and *Hadlai A. Hull*, for the plaintiffs.

*Frank T. Brown*, with whom was *John C. Geary*, for the defendant.

TORRANCE, J. In this case the plaintiffs, claiming to be the surviving members of a copartnership called The New London Lumber Company, alleged to have consisted of themselves and one Andrew J. Bentley now deceased, seek by way of equitable relief against the administratrix of Bentley, an adjustment of the copartnership accounts, and an accounting by the defendant for the property and effects of said copartnership received and possessed, as it is alleged, by Bentley, during his lifetime. Upon the pleadings and the finding of facts made by the trial court the case was reserved for the advice of this court.

The complaint is as follows: "1. That on the 2d day of November, A. D. 1885, they, the plaintiffs and the said Andrew J. Bentley of said town of New London, then in full life, entered into a copartnership at said town of New London, under the name and style of The New London Lumber Company, for the purpose of carrying on in said town of New London a lumber business; and that said copartnership so formed entered into the lumber business at said town of New London on said day, and that said copartnership was continued and carried on at said town of New London until the 1st day of January, A. D. 1893, when the same was dissolved by mutual consent. 2. By the terms of said copartnership agreement the said company was to and did receive from the said Andrew J. Bentley a large amount of property at an inventory price, which inventory and the said price affixed is now in the possession of the defendant and withheld by her from the plaintiffs. The said Andrew J. Bentley was to receive payment for said stock so delivered to said company at said inventory price, a reasonable sum as rental for the premises occupied by the said company, and repayment for and interest on all his contributions of capital to said company, in money or other property, at the rate of six per cent. per annum with annual rests, and the net profits of the business were to belong to the plaintiffs. 3. From the said 2d day of November, A. D. 1885, to the said 1st day of January, A. D. 1893, and during all the time and when said company was transacting its business as aforesaid, the said

Andrew J. Bentley, deceased, had in his possession certain goods, choses in action and moneys, of the aggregate value of $600,000, all of which belonged to the plaintiffs and the said Andrew J. Bentley, jointly, as such copartners, under the name and style of The New London Lumber Company, and which the said Andrew J. Bentley, deceased, possessed in part in his own right, and in part as bailiff of the plaintiffs, and had the care and management and disposition of the same for the mutual benefit of the plaintiffs and the said Andrew J. Bentley, deceased, as such copartners, and to render his reasonable account thereof when thereto requested. 4. At the time said copartnership was dissolved as aforesaid, the said Andrew J. Bentley took possession of all the effects of said copartnership, which were of great value, to wit, of the value of $20,000, and which belonged to the said Andrew J. Bentley in his own right jointly with the plaintiffs as copartners as aforesaid, and which the said Andrew J. Bentley then and thereafter possessed in part in his own right and in part as bailiff of the plaintiffs, to dispose of for the mutual benefit of the said Andrew J. Bentley and the plaintiffs, and to render his reasonable account thereof to the plaintiffs when thereto requested. 5. The said Andrew J. Bentley during his life did not render his reasonable account of said property and effects of said copartnership, so as aforesaid received and possessed by him in his own right and as bailiff of the plaintiffs during his lifetime, though often requested so to do. 6. On the 18th day of March, A. D. 1895, the said Andrew J. Bentley at said town of New London died intestate, and the defendant was by the Court of Probate for the probate district of New London, appointed, became and now is the lawful administratrix on his estate; and an order of limitation of time within which the creditors of said estate should present their claims to the defendant was passed by said Court of Probate. 7. The defendant has never rendered any account of said property or the proceeds thereof, so as aforesaid received and possessed by the said Andrew J. Bentley by him in his own right and as bailiff of the plaintiffs, since the decease of the said Andrew J. Bentley, though

often requested so to do. 8. There was due to the plaintiffs under said copartnership agreement from the said Andrew J. Bentley, at the time of his decease, and now is, upon a just and lawful accounting of the property so as aforesaid received and possessed by the said Andrew J. Bentley in his own right and as bailiff of the plaintiffs, the sum of $34,000, which has never been paid or any part thereof. 9. The plaintiffs presented the said claim of $34,000, with interest thereon, to the said defendant within the time allowed by the Court of Probate for the district of New London for the presentation of claims against the estate of said Andrew J. Bentley, and on the 23d day of December, A. D. 1895, the defendant disallowed in writing said claim.

" The plaintiffs claim, by way of equitable relief, an adjustment between the parties to this suit of the copartnership accounts of the said late copartnership, The New London Lumber Company. An accounting by the defendant for the property and effects of said copartnership, received and possessed by the said Andrew J. Bentley, deceased. $38,000, damages."

The answer filed reads as follows: "1. Paragraphs 2 and 8 of the plaintiffs' complaint are denied. 2. Paragraphs 6 and 9 are admitted. 3. As to paragraphs 1, 3, 4, 5 and 7, the defendant has not sufficient knowledge to form a belief."

Upon the trial of the cause upon these pleadings, the court found the following facts: —

"1. Andrew J. Bentley, against whose estate this action is brought, died on the 18th day of March, 1895. 2. The defendant, on the        day of March, 1895, was duly appointed and qualified as administratrix of his estate. 3. On the last day of October, 1885, said Bentley, who for a long time prior thereto had been, under the name of The Columbia Steam Saw & Planing Mills, engaged at New London in the wholesale lumber business, and, to a limited extent, in the retail lumber business, entered into an agreement with the plaintiffs, who for several years had been his employees in said business,—Moran from September, 1879, and Peck from November, 1881. 4. Mr. Bentley's purpose in entering into

this agreement was to assist the plaintiffs in a business start. 5. Said agreement was as follows: (*a*) Said Bentley, who was a man of property, agreed to furnish to the plaintiffs, both of whom were without means, a stock of merchandise, to enable them to carry on a retail lumber business at New London, under the name of The New London Lumber Co. (*b*) And further, that the stock of merchandise then in Mr. Bentley's retail department should be the stock so to be furnished by Mr. Bentley, and that the same should be taken at a valuation, and that the plaintiffs should pay said Bentley the value thereof, with interest at the rate of 6 per cent. per annum. (*c*) And further, that said Bentley should not be responsible for any of the debts of said company, should not bear any of its losses, nor participate in any of its profits. The profits were to be divided equally between Peck and Moran. (*d*) And further, that neither of the contracting parties was to endorse accommodation paper for outsiders, without the consent of the others. 6. Immediately after the making of this agreement the plaintiffs and said Bentley signed and caused to be published in two daily newspapers in the city of New London, the following, to wit: ' The New London Lumber Co. Yards, Winthrop St., E. New London. No crossing of railroad tracks. Spruce, hemlock and white pine lumber, lath and shingles. Wholesale and retail. We have the largest and best assortment in Eastern Conn. To Contractors and Builders we can offer very favorable prices. Spruce frames cut to build a specialty. William L. Peck, James Moran, Andrew J. Bentley, Special.' 7. In the same issue of one of the New London papers there appeared the following news item, which was known to and commented upon by Mr. Bentley: ' A new enterprise. The New London Lumber Co. is a new enterprise here, and one that is going to be successful from the start, for it possesses every element of success,—youth, energy and determination to overcome every obstacle. The firm is composed of William L. Peck and James Moran, with A. J. Bentley as a special partner. The names are enough to command the confidence of every one, and The Telegraph expects to chronicle the biggest boom in the lumber business

heretofore known in New London.'   8. After the making of
the agreement hereinbefore referred to, and up to the time
of his death, Mr. Bentley continued his wholesale lumber
business under the name of The Columbia Steam Saw &
Planing Mills, in which these plaintiffs had no pecuniary
interest except as mere employees, for they still continued in
the employ of Mr. Bentley in said wholesale business after the
making of said agreement, each at a salary paid by Mr. Bent-
ley.   9. After the formation of said The New London Lumber
Co., new sets of books were opened for each The New London
Lumber Co. and The Columbia Steam Saw & Planing Mills,
and it was agreed that the bookkeeper who kept these sets
of books should be paid by The New London Lumber Co.
The yards of the two companies were close together.   10. At
first it was the practice of Mr. Bentley to do the carting of
lumber and material for The New London Lumber Co., at a
price per thousand feet.   The practice was to give Mr. Bentley
credit for such amounts on the books of The New London
Lumber Co.   11. Subsequently this practice was changed,
and in place of it was substituted an arrangement by which
Mr. Bentley furnished at his own cost all the teams used in
the business of both lumber yards, and by which The New
London Lumber Co. was to furnish, at its own cost, the team-
sters for the teams, and also to furnish at its own cost the
men who worked in its own yard.   12. Subsequent to the
making of the agreement by which The New London Lumber
Co. was created, Mr. Bentley furnished the plaintiffs for the
retail trade the stock of goods agreed on, the value of which
was nearly $12,000.   This stock was inventoried and entered
on the books of The New London Lumber Co. as a charge to
it.   The amount was also credited to Mr. Bentley in the
books under the name of The Columbia Steam Saw & Plan-
ing Mills, and at various times thereafter said Bentley fur-
nished additional merchandise to said Lumber Company.
13. Between the formation and the dissolution of The New
London Lumber Co. the entire stock of goods had changed.
14. It was further agreed that neither Moran nor Peck
should draw any money from said Lumber Co., until such

time as the business should warrant it. 15. Such money as these plaintiffs had and drew during the lifetime of this concern was obtained and drawn under the following circumstances, and in the following manner, to wit: 16. When this Lumber Co. was formed both of the plaintiffs were in the employ of Mr. Bentley—Moran at the rate of $65 a month, and Peck at the rate of $550 per year for at least the first year he was in Mr. Bentley's employ, but what rate he actually received after this first year and up to the date of the formation of the New London Lumber Co., did not appear in evidence—nor was any specific rate agreed on by Peck and Bentley. 17. After the Lumber Co. was formed they continued in the employ of Mr. Bentley in his own sole and separate wholesale business, but no specific rate of wages was agreed upon for either of them. 18. Moran spent all of his time in Mr. Bentley's business; and Peck spent about one quarter of his time therein, and the rest of his time he spent in the business of The New London Lumber Co. 19. Mr. Bentley spent his time about his own separate business, giving little attention to the business of the Lumber Co., but did sometimes advise Peck when the latter sought his advice about matters of the Lumber Co. 20. From and after the formation of the Lumber Co., when either of these plaintiffs wanted money, they asked for such sums at the office as they wanted, and it was paid to them; Moran during this time drawing from Mr. Bentley at the rate of $150 per month, and Peck drawing at a larger rate per month than this, but what the exact rate was did not appear in evidence. 21. During the first four years of the existence of said New London Lumber Co. the bank deposit account, both for said company and for the Columbia Steam Saw & Planing Mills (which meant Mr. Bentley), were kept in the name of the Lumber Co., and checks were drawn thereon to pay both Lumber Co. obligations and Columbia Mills obligations; and during the remaining years of the life of said Lumber Co. said bank deposit account was kept in the name of The Columbia Steam Saw & Planing Mills, and checks drawn thereon to pay both Lumber Co. obligations and Columbia

Mills obligations. 22. These deposits were kept in the above manner simply as matter of convenience. The account books of the Lumber Co. and the account books of the Columbia Mills were so kept as to show the exact state of this deposit account between them. The ledger of The New London Lumber Co. and the ledger of The Columbia Mills both showed to which concern the money actually belonged, and these ledgers also showed for the benefit of which concern the several sums went that were checked out. 23. Some liens, to secure the price of lumber furnished by said New London Lumber Co., were placed upon the land records of New London and of Waterford. Liens for The Columbia Mills and liens for the said Lumber Co. were kept entirely distinct. 24. One of the Lumber Co.'s liens was sworn to and placed upon the records by Mr. Bentley, and one by Mr. Moran, and one by Mr. Peck, but all in the names of Peck, Moran and A. J. Bentley, describing them in some as partners under the firm name of The New London Lumber Co., and in another as ' associates ' under the name of The New London Lumber Co. 25. In one instance, on December 19th, 1889, a piece of land in Waterford was taken in payment of a $450 lumber bill due to the Lumber Co., and the deed marked Exhibit A, is the deed taken in such transaction. 26. In another instance the Lumber Co. furnished lumber to one Benjamin Stark, and took in its name in payment thereof an interest in a schooner ' Mary H. Brockway.' 27. On one occasion, to wit, on August 21st, 1891, subsequent to the taking of the deed named in paragraph 25, a deed of a small strip of the land, described in said deed, was executed by the plaintiffs and said Bentley, describing them as partners. 28. The remainder of said land, and said interest in the ' Mary H. Brockway.' remained in the name of the Lumber Co., and belonged to it. 29. During the existence of said Lumber Co. Mr. Bentley wrote some business letters in which he described Moran and Peck as partners of himself. 30. As to the public and persons dealing with the Lumber Co., it was the intention of the plaintiffs and Mr. Bentley to hold out Mr. Bentley's relation to the plaintiffs as that of a partner ; but as between

themselves, neither Mr. Bentley nor the plaintiffs had any intention that he (Bentley) should sustain to the plaintiffs any relation other than that of one furnishing a loan of capital and of credit. The business of The New London Lumber Co. was in fact the business of Moran and Peck, and the plaintiffs so understood it from the beginning; and these business relations of these three men continued just as they had been from the inception in 1885, without any change, down to December, 1892, when the matter of dissolution of The New London Lumber Co. hereinafter referred to came up. 31. It appeared in evidence that in the latter part of 1892 Mr. Bentley deemed it inadvisable to continue the transaction of the wholesale lumber business of himself and the retail business of the plaintiffs, through the agency of two concerns, and the formation was suggested by him of a corporation, to be known as the A. J. Bentley Lumber Co.; and in pursuance of this plan The New London Lumber Co. was dissolved, and the following notice, written by Mr. Bentley, and signed by Moran, Peck and Bentley, was published in the New London Day: 'NOTICE. The copartnership heretofore existing in the name and style of The New London Lumber Co. is this day dissolved by mutual consent. All persons having claims against said company are requested to present the same at once; and those indebted are notified to come and settle the same without delay, with either of the undersigns at the office of The Columbia Steam Saw & Planing Mills. James Moran. William L. Peck. A. J. Bentley, Special. New London, Dec. 31st, 1892.' 32. When this dissolution took place The New London Lumber Co. was owing Mr. Bentley, or what was the same thing, The Columbia Steam Saw & Planing Mills, for capital furnished, labor, and for interest on the capital so provided by Mr. Bentley; and the plaintiffs thereupon sold and transferred to Mr. Bentley, at an agreed price, the entire stock of merchandise of The New London Lumber Co. then on hand. 33. The accounts that were outstanding on the books of The London Lumber Co. were collected as they could be, and such collections as were made were entered on the books of The New London

Lumber Co.; and the money therefrom was turned into the bank deposit account of The Columbia Steam Saw & Planing Mills. These books, continuing to be kept right along, will show what was collected, and anything that is still outstanding and uncollected of these accounts these books should also show. 34. There never was any settlement between said plaintiffs and the said Bentley, and no evidence was offered to show which of said parties would be indebted to the other on such settlement. 35. I find that there was, as between said Bentley and the plaintiffs, no partnership, unless upon the foregoing facts such partnership existed as a matter of law. 36. At the session of the General Assembly next after the dissolution of said New London Lumber Co., to wit, in April, 1893, in pursuance of the plans to form a corporation to carry on the lumber business, Mr. Bentley procured the passage of a charter, which charter is found on page 320 of the Special Acts of that year, and begins with the following language: '*Resolved by this Assembly*, that Andrew J. Bentley, James Moran, and William L. Peck, all of the town of New London, and such other persons as shall be associated with them, be,' etc., etc. 37. When this plan of a new corporation was suggested and undertaken, it was understood that whatever sum upon a settlement of the affairs of The New London Lumber Co. was found to be coming to Moran and Peck over and above the debts of said company, and over and above what they owed Mr. Bentley, they were to have allowed them in the stock of this new corporation. 38. Mr. Bentley lived over two years after the dissolution of The New London Lumber Co. (the two plaintiffs remaining in his employ), and almost two years after the Act was passed incorporating the A. J. Bentley Lumber Co.; but it should be added in this connection that the work of the organization of the new concern was delayed on account of the extensive work of preparing the land purchased as a site for the new business, and such delay was, so far as appeared in evidence, without any fault on the part of the plaintiffs. Mr. Bentley returned from the South shortly before his death, to complete the plans for organizing said corporation, but became too ill

402

JULY, 1897.

Moran et al. *v.* Bentley, Admx.                    Vol. 69

to do so, and died before said corporation was organized, or any of its stock subscribed for. 39. The accounts of The New London Lumber Co. and the accounts of The Columbia Steam Saw & Planing Mills are quite voluminous, and the examination thereof, and an accounting, would probably consume considerable time."

The general question arising upon this record is as to what judgment shall be rendered thereon; and the answer to this depends upon two other questions, namely: (1) Does the finding support the complaint. (2) If not, are the plaintiffs entitled to an accounting upon the facts as found.

The complaint alleges that Bentley was a partner in The New London Lumber Company; that he sold and delivered the merchandise mentioned in the complaint, to that firm; that during all the time the copartnership existed he had in his possession goods, choses in action and moneys, of said firm, to the value of $600,000, and had the care and management of the same for himself and as bailiff of the plaintiffs; and that when the firm dissolved he took possession of all its effects, amounting to $20,000, to dispose of the same for the mutual benefit of himself and the plaintiffs, and to render an account thereof when requested, which he never rendered though often requested to do so.

The finding is that Bentley was not a partner, unless upon the facts found, as matter of law, he was one; and we are of opinion that as matter of law he was not a partner. The clear import of the finding is that the plaintiffs and Bentley agreed that as between themselves Bentley should not be a partner. All that he did and said, as found upon the record, was done at the request of the plaintiffs, " to assist the plaintiffs in a business start," and " to enable them to carry on a retail lumber business at New London under the name of The New London Lumber Co." It was distinctly understood and agreed between Bentley and the plaintiffs, from beginning to end, that the plaintiffs were the partners; that Bentley was not a partner, notwithstanding the fact that he was to be held out, and was to hold himself out at all times to the world as a partner; and that Bentley's sole relation to

the plaintiffs was, and was to remain, that of a creditor "furnishing a loan of capital and of credit."

Here, then, was an express agreement on the part of the plaintiffs that if Bentley, for their benefit, would assume, as to outsiders, all the liability of a partner, he should still remain as to them, what he in fact was, not a partner, but a creditor. The law did not forbid the making of such an agreement, and we see no reason why the plaintiffs should not be bound by it.

It being thus found that Bentley was not a partner, one of material allegations of the complaint is negatived; and this being so, it follows by way of inference, and it is also in effect found, that the other material allegations in the second, third and fourth paragraphs of the complaint, dependent upon the alleged copartnership, are also negatived. It thus appears that the plaintiffs' case as alleged in the complaint, and the plaintiffs' case as found by the court, differ from each other very materially. The case as alleged is based on the existence of a copartnership between Bentley and the plaintiffs for seven or eight years; while the case as found is that no such copartnership ever existed.

The relief prayed for is based entirely upon the case as alleged in the complaint: it is, specifically, for an adjustment of the copartnership accounts, and, in effect, for an accounting by Bentley as a copartner, through his representative. A judgment in favor of the plaintiffs upon this record would be one based upon a cause of action not alleged, and would be erroneous if properly objected to. *Greenthal* v. *Lincoln, Seyms & Co.*, 67 Conn. 372; *Pitkin* v. *N. Y. & N. E. R. R. Co.*, 64 id. 482.

This is not a case of mere variance, or mere defect of proof, but a case of failure to prove the cause of action alleged, in its entire scope. As is well said in *Southwick* v. *First Nat. Bank of Memphis*, 84 N. Y. 420–428, pleadings are essential in every system of jurisprudence and there can be no orderly administration of justice without them; but if a party can allege one cause of action and then recover upon

another, his complaint will serve no useful purpose, it will rather serve to ensnare and mislead his adversary.

Nor is this a case where the complaint can, after trial, be amended so as to conform to the proof, without entitling the defendant to a trial of the facts alleged in the amended complaint; for such an amendment would of necessity change substantially the cause of action now stated, and this would entitle the defendant to file new pleadings and to a trial of the new case thus presented. *Bennett* v. *Collins*, 52 Conn. 1, 3; *Pitkin* v. *N. Y. & N. E. R. R. Co.*, 64 id. 482. Under these circumstances we do not feel called upon to express any opinion upon the question whether, if the cause of action found had been the cause of action alleged, the plaintiffs, upon the facts found, would or would not be entitled to an accounting.

As we understand the record, the only question presented by it is whether, upon the pleadings as they stand, the plaintiffs upon the facts found are entitled to a judgment for an accounting, and we are of opinion that they are not, and the Superior Court is so advised.

In this opinion the other judges concurred.